AO 91 (Rev. 11/11)  Criminal Complaint

SEALED BY ORDER OF THE COURT

# UNITED STATES DISTRICT COURT
### for the
### Northern District of California

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| GEOFFREY MARK PALERMO | )  Case No.3:20-mj-70681 AGT |
| | ) |
| | ) |
| | ) |
| _____ | ) |
| *Defendant(s)* | |

**FILED**

Jun 01 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  December 2013 through April 2020  in the county of  San Francisco and Marin  in the

Northern  District of  California , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1343, 1346 | Count One: Wire Fraud and Honest Services Wire Fraud |
| 18 U.S.C. § 1343 | Count Two: Wire Fraud |
| 18 U.S.C. § 1014 | Count Three: False Statement in Loan Application to Federally Insured Bank |
| | Max. Penalties: Counts One & Two: Up to 20 yrs. imprisonment; $250,000 fine or twice the gross gain/loss; 3 yrs. supervised release; $100 mandatory special assessment; Count Three: Up to 30 yrs. imprisonment; $1,000,000 fine; 3 yrs.' supervised release; $100 mandatory special assessment |

This criminal complaint is based on these facts:

See attached Affidavit of FBI Special Agent Alexandra E. Bryant

☑ Continued on the attached sheet.

Approved as to form *Katherine L Wawrzyniak*
AUSA Katherine L. Wawrzyniak

/s/ Alexandra Bryant
via telephone

*Complainant's signature*

Alexandra E. Bryant, Special Agent, FBI

*Printed name and title*

Sworn to before me and signed ~~in my presence~~.  via telephone.

Date:  5/29/2020

*Judge's signature*

City and state:  San Francisco, CA

Hon. Alex G. Tse, U.S. Magistrate Judge

*Printed name and title*

### AFFIDAVIT OF SPECIAL AGENT ALEXANDRA BRYANT IN SUPPORT OF CRIMINAL COMPLAINT

I, Alexandra Bryant, a Special Agent of the Federal Bureau of Investigation, being duly sworn, hereby declare as follows:

### I.     OVERVIEW AND AGENT BACKGROUND

1.     I make this affidavit in support of a three-count Criminal Complaint against GEOFFREY MARK PALERMO (hereinafter PALERMO):

a. Count One: Wire Fraud and Honest Services Wire Fraud, for a kickback scheme PALERMO orchestrated from 2013 through 2016 while managing the Hilton hotel at 750 Kearny Street in San Francisco, CA, in violation of 18 U.S.C. §§ 1343, 1346;

b. Count Two: Wire Fraud, for defrauding a Small Business Administration (SBA) Preferred Lender in connection with obtaining $5 million in SBA-guaranteed loans in 2019, in violation of 18 U.S.C. § 1343;

c. Count Three: False Statement in a Loan Application, for making false certifications in April 2020 in order to obtain a Paycheck Protection Program (PPP) loan through an FDIC-insured bank, in violation of 18 U.S.C. § 1014.

For the reasons set forth below, I believe there is probable cause to believe PALERMO has committed each of the foregoing violations of federal law.

2.     The statements contained in this affidavit come from my personal observations, my training and experience, information from records and databases, and information obtained from other agents and witnesses. This affidavit summarizes such information in order to show that there is probable cause to believe that PALERMO has committed the violations listed above. This affidavit does not purport to set forth all of my knowledge about this matter, or to name all of the persons who participated in these crimes.

3.      I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed for approximately three years. I am currently assigned to a Complex Financial Crime Squad of FBI's San Francisco Field Division. As part of my assigned duties, I investigate possible violations of federal criminal law, specifically investigations involving white collar crime.

## II.      APPLICABLE LAW

4.      Title 18, United States Code, Section 1343 provides: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both."

5.      Title 18, United States Code, Section 1346 provides: "For the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."

6.      Title 18, United States Code, Section 1014 provides, in relevant part: "Whoever knowingly makes any false statement or report…for the purpose of influencing in any way the action of…any institution the accounts of which are insured by the Federal Deposit Insurance Corporation…upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, loan, or insurance agreement or application for insurance or

2

a guarantee, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefor, shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both…"

### III.    FACTS SUPPORTING PROBABLE CAUSE

#### A.  Executive Summary

7.      PALERMO is a 56-year-old male living in Novato, CA. From approximately 2008 until approximately June 2016, PALERMO worked as a manager at the Hilton hotel at 750 Kearny Street in San Francisco, CA, which is owned and operated by Justice Investors LP ("Justice Investors"), a California limited partnership based in Los Angeles.[1] PALERMO was a Managing Director of Justice Investors. Between approximately December 2013 and June 2016, GMP Management, a California corporation wholly owned and controlled by PALERMO, had a contract with Justice Investors for administration and management of the property. PALERMO used that arrangement to embezzle large sums from Justice Investors, including through capital improvement kickback schemes.[2] As further detailed below, PALERMO would demand kickbacks from contractors performing work at the hotel. The contractors would create false or inflated invoices to Justice Investors. PALERMO would cause Justice Investors to pay the invoices, and then the contractors would pay some of the funds to PALERMO (or entities controlled by PALERMO) via check or cash. As further detailed below, the investigation has revealed that one such contractor, A.R., paid approximately $1.5 million in kickbacks to PALERMO between March 2013 and June 2016.  This conduct is the subject of Count One.

---

[1] Approximately 93% of Justice Investors is owned by Portsmouth Square, a subsidiary of the public real estate company InterGroup Corporation ("InterGroup").  PALERMO is a minority partner in Justice Investors and owns approximately 3%.

[2] In 2018 Justice Investors filed a civil complaint in San Francisco Superior Court against PALERMO relating to PALERMO's management of the Hilton.  The complaint alleged more than $10 million in losses due to multiple embezzlement and fraud schemes. The dispute is now in JAMS arbitration.

8.      PALERMO resigned from Justice Investors in June 2016. Thereafter, he focused his attention on GMP Cars, a set of collision and auto repair centers in the Bay Area owned by PALERMO. The GMP Cars office is located at 20 Pimentel Court, Building C Suite 4, Novato, CA, and there are approximately six repair centers still open today in Novato, Fremont, Santa Rosa, San Francisco, Vallejo, and Fairfield.  As further detailed below, PALERMO has used GMP Cars' funds to pay for personal auto racing expenses and other lifestyle purchases, leaving the company with mounting debt. In 2019, PALERMO applied for and eventually secured two loans to GMP Cars for a total of approximately $5 million from a U.S. Small Business Administration Preferred Lender ("Lender 1"). The SBA guaranteed 75% of the loans from Lender 1 to GMP Cars under the SBA's Section 7(a) program. PALERMO made several material omissions and false statements during the 2019 loan application process in order to induce Lender 1 to make the loans. This scheme to defraud is the subject of Count Two.

9.      In 2020, after he was aware that he was the target of a federal criminal investigation, PALERMO applied for and received approximately $1.7 million through the SBA's Paycheck Protection Program (PPP). The PPP is a relief program offered through participating lenders to aid small businesses during the COVID-19 pandemic. PPP funds can be used to pay up to eight weeks of payroll costs, including benefits, and also for rent, utilities, and interest on mortgages. In early April 2020, PALERMO applied for a PPP loan through an FDIC-insured bank ("CP Bank"). In the application, PALERMO falsely certified that he had employees for whom he paid salaries and payroll taxes; in fact, PALERMO has not been paying payroll taxes for GMP Cars employees as required since mid-2019. The false statement to CP Bank is the subject of Count Three below.

10.      The remainder of this affidavit will lay out the facts supporting each Count in detail. This affidavit is based on FBI interviews, information from other law enforcement officers, and the review of financial and business records.

4

**B.  Count One: San Francisco Hilton Wire Fraud/Honest Services Wire Fraud**

11.     The San Francisco Hilton is a 544-room hotel located in Chinatown's Portsmouth Square. PALERMO began working at the hotel in the early 2000s. The hotel was completely renovated in 2006. In November 2008, after Justice Investors took ownership of the property, PALERMO became a Managing Director of Justice Investors. As an officer of Justice Investors, PALERMO owed fiduciary duties to Justice Investors, including the duty to refrain from self-dealing. Throughout the time period 2008 through 2016, PALERMO oversaw and managed various construction and repair projects at the hotel. He had considerable discretion in choosing contractors to complete projects and had authority to sign contracts on behalf of the hotel.

12.     On December 1, 2013, GMP Management entered into a Management Services Agreement with Justice Investors, under which PALERMO and GMP Management would manage the hotel for a term of three years. Pursuant to the Management Services Agreement, Justice Investors paid GMP Management set management fees—$325,000 the first year, with a five percent cost-of-living increase for each of the next two years. GMP Management and PALERMO submitted an annual budget to Justice Investors that included the salary expenses for GMP Management employees and other operating expenses. As part of the contract, GMP Management was not to receive payments in excess of the management fees and approved budget without the approval of Justice Investors, PALERMO, and one other GMP Management employee. Also as part of the contract, GMP Management was not to conduct any business that was adverse to the interests of Justice Investors without prior approval.

13.     PALERMO was the President of GMP Management and had authority, under the Management Services Agreement, to enter into contracts on behalf of Justice Investors and to choose contractors and otherwise manage construction and capital improvement projects at the hotel. Per the terms of the Management Services Agreement, contracts for over $25,000 were to be approved by Justice Investors, and payments in excess of $25,000 required approval by

Justice Investors and co-signature of at least one employee of GMP Management in addition to PALERMO.

14.     PALERMO opened Justice Investors accounts at East West Bank and had check signing authority for these accounts in the period from December 2013 to 2016.[3] PALERMO also opened Justice Investors accounts at Wells Fargo and had check signing authority for these accounts in the period from December 2013 to 2016. PALERMO would have the Hilton's controller wire funds from the Hilton's operating accounts to the Justice Investors' accounts.

15.     As noted above, PALERMO effectively controlled capital improvement and construction projects at the Hilton. Two of the main contractors used by PALERMO from December 2013 to June 2016 were A.R. and Contractor 2. A.R. owned and operated a construction company. ████████████████████████████████████████████ ████████████████

16.     A.R. worked on various construction projects at the Hilton hotel beginning no later than in or around 2006. In a recorded statement, A.R.'s ex-wife said that around the time of the 2006 remodel, A.R. worked at the hotel seven days a week. A.R. would inflate his construction company's invoices. PALERMO would have Justice Investors pay the invoices via check. A.R. told his ex-wife that part of the money was for materials, part was for PALERMO, and part was for A.R. A.R.'s ex-wife recalled taking yellow envelopes of cash to PALERMO in either the parking lot of the hotel or PALERMO's house in Novato, California. A.R. and his ex-wife split up in or about 2009. Thereafter, the ex-wife did not have direct knowledge of kickbacks A.R. paid PALERMO.

---

[3] During the same period, PALERMO had also opened GMP Management accounts, a GMP Cars account, and a Da Vinci Villa account at East West Bank. PALERMO managed the Da Vinci Villa Hotel at 2550 Van Ness Avenue in San Francisco between approximately 2013 and 2016 without disclosing this potentially adverse business interest to Justice Investors.

17.     Between 2013 and 2016, Justice Investors paid A.R.'s construction company approximately $6.4 million for construction projects. I have reviewed invoices from A.R.'s construction company to Justice Investors. One invoice dated December 4, 2014, was for $5,299,800 and was a one-page invoice for the remodeling of all 550 hotel room bathrooms of the Hilton. The invoice had "construction" misspelled in A.R.'s business logo. According to Justice Investors, much of the work A.R. performed at the Hilton was unpermitted. Further, A.R. had a general contractor's license and was not approved for many of the specialty one-trade projects he was awarded by PALERMO.

18.     A review of bank records shows that during the 2013 through 2016 timeframe (and possibly going back further), A.R. would deposit checks from Justice Investors into a checking account in the name of A.R.'s construction company ("Construction Account") at Redwood Credit Union.[4] A.R. would then transfer funds from the Construction Account to a different Redwood Credit Union account that he controlled, in the name of The Bahama Reef Living Trust ("BRLT Account").[5] A.R. would then write checks from the BRLT Account to PALERMO, GMP Cars, or other entities/individuals associated with PALERMO. From March 2013 to June 2016 A.R. wrote a total of approximately $1,535,965 in such checks to PALERMO or GMP Cars.

19.     An example of this kickback scheme, and Count One of this complaint regards a series of deposits and transfers of funds between on or about October 21, 2015 and on or about October 23, 2015:

        a.     On October 21, 2015, A.R. deposited four checks from Justice Investors to the
               Construction Account. The four checks totaled $145,915. Copies of these check

---

[4] The Construction Account was opened by A.R. on April 3, 2010 and closed in June 2017.
[5] The BRLT Account was opened by A.R. and his wife at the time on March 1, 2011 and closed in September 2016. A.R. and his then wife were the trustors and trustees of BRLT, a revocable trust. Records from the credit union indicate no beneficiaries were designated for the BRLT.

images can be found in Exhibit 1, hereto. The memo lines for the four checks listed construction projects at the Hilton.

b.   On October 21, 2015, after depositing the checks, A.R. transferred $125,000 from the Construction Account to the BRLT Account. Also on October 21, 2015, A.R. wrote a check for $125,000 from the BRLT Account to GMP Cars LLC with the memo "2016 Porsche RS". An image of this check can be found in Exhibit 1.

c.   On October 22, 2015, PALERMO deposited the $125,000 check from the BRLT Account into a GMP Cars LLC account. I know from my discussions with Redwood Credit Union that when PALERMO deposited this check, Redwood Credit Union used the Federal Reserve system to clear the check and information about the check was transmitted in interstate commerce.

d.   On October 23, 2015, PALERMO wired $196,155.01 from the GMP Cars LLC account to Porsche Financial Services. I believe this Porsche to be for PALERMO. On December 21, 2015 PALERMO wrote a check for $1,100 to Professional Window Tinting for "window tint blue special Porsche" and then on March 9, 2016 PALERMO wrote a check for $21,391 to the DMV for "Porsche title". I assume these to be payments in connection to the purchase of a Porsche by PALERMO.

20.



21.      

22.      I believe the arrangements with A.R. and Contractor 2 were a kickback scheme in violation of 18 U.S.C. §§ 1343, 1346 in which PALERMO sought to personally profit. I believe PALERMO secretly demanded, received, and accepted money and things of value from both contractors in exchange for PALERMO's failing to faithfully perform his duties under the Management Services Agreement, contrary to the interests of Justice Investors, including but not limited to, by approving and causing Justice Investors to pay fraudulent invoices from both contractors. PALERMO also engaged in certain conduct and made, in sum and substance, materially false and fraudulent pretenses, representations, and promises to Justice Investors and concealed material facts from Justice Investors including but not limited to, directing checks to both contractors' companies and converting for his own use the money he unlawfully obtained. In fact, as described below, PALERMO took steps to hide his scheme from Justice Investors and InterGroup when he abruptly left in June 2016.

23.      By the end of 2015, InterGroup, the corporate parent of Justice Investors, was concerned about why the Hilton was not generating cash and had started to request detailed financial reporting from PALERMO. Previously InterGroup had only seen summary financials.

24.     PALERMO terminated the Management Services Agreement on June 8, 2016 and abruptly left the Hilton. PALERMO had his office packed up and numerous boxes of files removed from the Hilton premises. An InterGroup employee who went to the Hilton after PALERMO left found the office emptied. This InterGroup employee reviewed Hilton security footage and saw the boxes being moved and taken from the Hilton. Since leaving the Hilton, PALERMO has returned some files to InterGroup, but has still not returned many financial records.

25.     Additionally, I interviewed the owner of an IT company that PALERMO had used to assist with GMP Management's electronic files. This person told me that the server that contained all of GMP Management's files, including files related to the Hilton, was located at the Da Vinci Villa Hotel, not at the Hilton. This is why InterGroup could not find a server in the office or access Justice Investors' electronic documents when PALERMO left.

26.     PALERMO also attempted to have all of the Justice Investors email accounts used by PALERMO and his employees deleted at the time of his departure. However, InterGroup hired a forensic IT firm and was able to recover some of these emails. PALERMO also asked the IT professional described above to put a copy of all of the Justice Investors' emails on an external hard drive for PALERMO. The IT professional complied and did not know what PALERMO did with the hard drive.

**C.   Count Two: SBA 7A Loan Fraud**

27.     After PALERMO departed the Hilton in mid-2016, he focused his attention on GMP Cars, an automotive services group that advertises a variety of services, including collision, aftermarket, restoration, paint protection, audio and electronics and exotic car service. By at least 2019, I believe GMP Cars was in immense financial difficulty due to PALERMO's lavish spending habits. As detailed below, by mid-2019, PALERMO had (i) significantly overdrawn GMP Cars bank accounts; (ii) used a friend's American Express to cover expenses; (iii) failed to

pay a number of vendors; and (iv) failed to make payments due in connection with the acquisition of the German Motors Collision Center. PALERMO disguised the true financial condition of GMP Cars when he applied for and received $5 million in loans from Lender 1 in 2019. Not only did he fail to disclose material information, such as the overdraft, he also submitted at least one falsified document to Lender 1. Understanding the true state of GMP Cars in 2019 is key to understanding why PALERMO needed to lie in order to secure additional funding. Therefore, I provide facts related to items (i)-(iv) before discussing the 2019 loan.

***CW Bank Overdrafts***

28.     PALERMO opened a number of business accounts at an FDIC-insured bank ("CW Bank") starting in August 2018. These accounts included accounts for each GMP Cars location and a GMP Cars LLC – Operating account ("Operating Account"). PALERMO, GMP Cars' controller, and an additional GMP Cars' employee were signatories on the accounts.

29.     By the summer of 2019, many of the GMP Cars accounts at CW Bank began to show up on CW Bank's daily overdraft report. GMP Cars was writing checks with insufficient funds to cover the checks, depositing checks that bounced, and overdrawing the accounts. A CW Bank employee regularly spoke to PALERMO about these issues. On August 20, 2019 a CW Bank employee sent PALERMO and the GMP Cars' controller an email, explaining that two of the checking accounts needed $850,926.60 to cover the overdraft in the accounts.  A copy of this email can be found in Exhibit 2 hereto.

30.     GMP Cars accounts at CW Bank continued to be overdrawn into September 2019. While CW Bank told PALERMO it preferred wires or Cashier's Checks to cover the overdraft, in September 2019, a CW Bank employee agreed to accept personal checks from PALERMO's personal bank account to cover the overdraft of the Operating Account. PALERMO represented to this CW Bank employee that he was in the hospital for heart surgery and could not do wires, but had enough funds in his personal account (at another bank) to cover his personal checks.

11

PALERMO provided three personal bank checks to cover the overdraft in the Operating Account—one dated September 10, 2019 for $150,000; one dated September 11, 2019 for $190,000; and one dated September 12, 2019 for $195,000. All three checks bounced due to insufficient funds, and by September 30, 2019 the Operating Account was overdrawn by $738,706.44. Thereafter, CW Bank restricted all of PALERMO's accounts.

31.     PALERMO eventually spoke to CW Bank employees after his accounts were restricted. According to an FBI interview of one of these employees, PALERMO first blamed his other banks for the checks bouncing, as well as his hospitalization. Eventually, PALERMO admitted he did not have the funds to cover the overdraft and was waiting on an SBA loan. The Operating Account had a negative $594,325.16 balance as of October 31, 2019 and negative $338,875.08 balance as of November 29, 2019.

32.     PALERMO did not disclose any of the foregoing to Lender 1.

***American Express Charges***

33.     In or about 2017, INVESTOR A invested $100,000 in GMP Cars in exchange for a 1% ownership stake in GMP Cars. The deal was done on a handshake and not reduced to writing. Based on a FBI interview of INVESTOR A, by the summer of 2019 PALERMO claimed GMP Cars did not have a line of credit and was having cash flow timing problems. PALERMO and asked INVESTOR A for a $50,000 check that he would pay back in a few days. INVESTOR A agreed, gave PALERMO a $50,000 check, and then PALERMO wrote INVESTOR A a $50,000 check a few days later.

34.     Eventually PALERMO asked if he could charge INVESTOR A's American Express card, again claiming GMP Cars did not have a line of credit and had cash flow timing issues. INVESTOR A agreed to the one-time use of his credit card. PALERMO, however, used INVESTOR A's American Express card multiple times, and by September 2019, INVESTOR A's American Express card had approximately $190,000 in unauthorized GMP Cars charges, for

which PALERMO had not reimbursed INVESTOR A. INVESTOR A cancelled this card. As of January 2020 PALERMO still owed INVESTOR A $171,000 of the $190,000.

35.    The debt to INVESTOR A was not disclosed to Lender 1.

36.    It bears noting that a review of PALERMO's American Express records from January 2015 to August 2019, reveals that PALERMO made payments to his and his wife's American Express cards totaling approximately $10,745,300.82. Major expenditures included approximately $1,731,382.41 at R3 Motorsports from August 2016 to August 2019. R3 Motorsports provided mechanical and repair support for PALERMO and his wife's race cars so that they could race in Ferrari Challenges. My review of other financial records shows that PALERMO would take funds from GMP Cars accounts to pay for his racing costs and American Express. In addition to paying R3 Motorsports, PALERMO had to pay Ferrari annually to enter the Ferrari Challenges, pay for tires for the race cars, and obtain racing vehicles from the Ferrari of San Francisco dealership. I have observed some of these charges on PALERMO'S American Express statements. PALERMO claimed to Lender 1 that the Ferrari racing was part of marketing for GMP Cars.

37.    Other notable American Express charges for the same time period included $59,808.86 at Nordstrom, at least $290,251.71 in airline expenditures, at least $253,900.97 in hotel expenditures, and $47,760 at a San Francisco jewelry store. I believe these records evidence PALERMO's lavish lifestyle.

38.    In my review of PALERMO's American Express records, I also noted that from July 2018 to August 2019, PALERMO charged approximately $1,061,110 to his American Express card at different GMP Cars locations. Similar to the behavior with INVESTOR A's American Express card, I believe PALERMO did this to generate cash at the stores and possibly also to artificially inflate revenue.

13

39.     On August 31, 2019 American Express reduced PALERMO's spending limit from $200,000 to $50,000. PALERMO had a balance of $192,405.20 as of August 31, 2019. By December 31, 2019, PALERMO still owed American Express approximately $192,000 and American Express ended up cancelling PALERMO's account due to lack of payment.

### GMP Cars' Revenue and Vendor Payments

40.     I have interviewed current and former GMP Cars employees who have told me that GMP Cars was not generating a profit in 2019.

41.     A former general manager of one GMP Cars location told me that GMP Cars had a bad reputation with other auto shops and auto parts vendors. Some auto part vendors would not sell GMP Cars parts and others would not allow GMP Cars to pay by check. PG&E would shut off the electricity in 2019 for non-payment. Employees' paychecks sometimes bounced. During the time he was employed, the former general manager received a daily spreadsheet tracking the sales and costs at each location. PALERMO would have regular discussions with the managers about how much their stores were losing. Based on these spreadsheets and discussions with PALERMO and the other managers, the person I interviewed believed almost every store was operating at a loss in 2019 and there was no way the company was generating a profit.

42.     The FBI interviewed a current staff accountant at GMP Cars who also confirmed that in 2019 GMP Cars was not generating a profit. This staff accountant worked under the controller and was in charge of creating a daily report that showed profit and loss. This report was sent to PALERMO and the chief operating officer at GMP Cars. The staff accountant's report looked at sales at each location minus the cost of goods sold, rent, and payroll. The staff accountant's report was consistently negative for each location in 2019. The staff accountant did not think there was any way the company was generating a profit or positive net income in 2019.

14

43.     There are at least three lawsuits against GMP Cars for lack of payment, fraud and deceit, or breach of contract. Future Nissan filed a complaint against GMP Cars in Marin County in February 2020 for lack of payment on auto parts received in 2019, with losses totaling $23,290.75. A receiver for a set of dealerships filed a complaint against GMP Cars in Solano County in November 2019 for unpaid balances totaling $64,874.50, and three cars that were not returned to the dealership totaling $118,341.

44.     Additionally, FinishMaster, a paint company, filed a complaint against GMP Cars in federal district court in Indiana in December 2019 for breach of contract. I have learned that the automotive paint industry will sometimes give businesses advances or credits for agreeing to buy a certain amount of paint over a period of time and agreeing to exclusively use that paint company. The advance is meant to be used only for working capital for the auto shop and auto shop improvements. FinishMaster alleges that in August 2018, six of the GMP Cars locations agreed to purchase 100% of their paint and material requirements exclusively from PPG through FinishMaster and to be current in their accounts. In return FinishMaster gave GMP Cars an advance credit of $750,000 to be spent on shop improvements and equipment. FinishMaster gave GMP Cars an additional $50,000 credit in October 2018. FinishMaster alleges that GMP Cars stopped paying for its purchases on time and told FinishMaster that GMP Cars would not exclusively use PPG paint. The six locations owe FinishMaster $902,681.29. GMP Cars held accounts at Presidio Bank during this period and this is where the FinishMaster advances were deposited.

45.     None of the aforementioned business disputes/lawsuits were disclosed to Lender 1. Additionally, the financial statements submitted to Lender 1 in connection with the 2019 loan showed that each GMP Cars location generated positive net income in 2019.

***German Motors Collision Center Acquisition***

46.     PALERMO bought the German Motors Collision Center from German Motors Corporation (owners of BMW of San Francisco) on January 31, 2019, for approximately $5.2 million. The German Motors Collision Center became GMP Cars San Francisco.

47.     The president and vice president of German Motors Corporation stated during an FBI interview that they were surprised at the closing because PALERMO wired approximately $1.1 million, but then wanted to enter into a promissory note for the remaining $4.15 million due. German Motors Corporation agreed to the promissory note dated January 31, 2019, which called for monthly installment payments of principal ($250,000) and interest (8%) until the maturity date of December 31, 2019. PALERMO also pledged in the note to auction a number of vehicles and provide the net proceeds to German Motors Corporation.

48.     Soon after the first two monthly payments were due, PALERMO stopped paying the principal amounts owed. German Motors Corporation ended up entering into a modification to the promissory note with PALERMO, dated May 31, 2019, to reflect these issues. The first modification required approximately $203,553 due at signing to go toward unpaid interest and principal. PALERMO was also supposed to send $500,000 within 60 days of this updated note, but PALERMO did not do so. PALERMO also did not auction off the vehicles as specified in the January 21, 2019 note and first modification. The outstanding principal amount as of May 30, 2019 was $3,927,666.67

49.     Due to continued lack of payment, German Motors Corporation entered into a second modification to the promissory note with PALERMO dated August 20, 2019. This second modification required a number of principal payments to be made within in a short period including $500,000 made by the earlier of September 27, 2019 or PALERMO securing a loan to cover his debts. The outstanding principal amount on the note as of August 31, 2019 was $3,827,666.67.

50.     PALERMO misled Lender 1 regarding his debt to German Motors Corporation. As explained below, I believe that PALERMO provided a false version of the January 2019 promissory note to Lender 1 and did not provide copies of the May 31, 2019 or August 20, 2019 modifications.

**_Loan Fraud_**

51.     PALERMO applied for two SBA-guaranteed loans with Lender 1 in the summer of 2019.

52.     PALERMO filled out the initial SBA 7(a) Borrower Information Form on August 8, 2019. By September 26, 2019, Lender 1 had done its initial underwriting and created an approval memo for Lender 1's loan committee. PALERMO applied for a $1,584,000 SBA loan to purchase commercial real estate, and a $3,250,000 SBA loan to refinance business debt and to buy out PALERMO's silent partner in GMP Cars, Investor K.

53.     On October 1, 2019, Lender 1 issued a conditional commitment letter to GMP Cars saying they would submit the loan application for consideration to the SBA.

54.     Both loans closed on December 19, 2019. Of the $3,250,000 loan, $2,475,000 was wired to Investor K and his associated trust; $548,705.42 was wired to Presidio Bank to pay off an existing loan taken out by PALERMO, and $111,101.91 was wired to GMP Cars accounts held at Redwood Credit Union. (PALERMO opened accounts at Redwood Credit Union after his accounts were restricted at CW Bank.)

55.     As part of the loan application completed on August 8, 2019, PALERMO provided GMP Cars debt schedule as of June 30, 2019. As part of the loan closing process, GMP Cars also provided a debt schedule as of September 30, 2019. German Collision Center is listed on both debt schedules. The monthly payments listed for German Collision Center is $24,517.78 for June 30, 2019 and $24,518 for September 30, 2019. The interest rate was listed at 8% and the maturity date as December 31, 2019 for the German Collision Center in both debt schedules. The

September 30, 2019 debt schedule did <u>not</u> include the $738,706.44 overdraft in the Operating Account at CW Bank.  Nor did it include the $190,000 owed to Investor A for charges on his American Express card.

56.     I believe PALERMO made material misstatements regarding the acquisition of German Collision Center to Lender 1 during the loan application process. PALERMO, as part of the loan application process, provided a supposed copy of the January 31, 2019 promissory note he entered into with German Motor Corporation. I believe this to be an altered version of the correct promissory note. Exhibit 3 hereto contains the first page of promissory note provided to Lender 1 and Exhibit 4 contains the first page of the promissory note provided to the FBI from German Motors Corporation. I believe paragraphs 2.2 and 3 were altered to make it appear that PALERMO only owed monthly interest payments and the maturity date was 2021, when in fact in the original promissory note, PALERMO owed interest *and* principal payments and the maturity date was December 31, 2019.

    a.   Paragraphs 2.2 of the falsified version (Exhibit 3) states "*Monthly Installment Payments. The parties hereto acknowledge that the Maker shall pay installments of principal and interest under this Note in the amount of: (i) all of the net proceeds from the sale of certain cars to be sold at R&M Sotheby's on March 6 and 7, 2019 at Amelia Island, a description of which is attached hereto as Exhibit A, and (ii) payments of interest on the outstanding principal, commencing on March 1, 2019, and continuing on the 1st day of each calendar month thereafter until, but excluding, the Maturity Date*." The Maturity Date listed is February 28, 2021.

    b.   What I believe to be the correct version (Exhibit 4) states "*Monthly Installment Payments. The parties hereto acknowledge that the Maker shall pay installments of principal and interest under this Note in the amount of: (i) all of the net*

18

*proceeds from the sale of certain cars to be sold at R&M Sotheby's on March 6
and 7, 2019 at Amelia Island, a description of which is attached hereto as Exhibit
A, and (ii) the amount of Two Hundred Fifty Thousand Dollars ($250,000),
commencing on March 1, 2019, and continuing on the lst day of each calendar
month thereafter until, but excluding, the Maturity Date*". The Maturity Date
listed is December 31, 2019.

57.     As stated earlier, PALERMO fell behind on the monthly payments of principal
and interest due to German Motors Corporation. German Motors Corporation agreed to an
extended maturity date of February 28, 2021 in the first modification of the promissory note in
May 2019; not in the original January 31, 2019 promissory note.

58.     PALERMO did not provide the modifications of the promissory notes from May
and August 2019 to Lender 1. PALERMO also did not tell Lender 1 he was behind on payments
to German Motor Corporation. PALERMO tried to hide the large payments due to German
Motor Corporations by first supplying false debt schedules as June 30, 2019 and September 30,
2019 that implied PALERMO did not owe large principal payments, then providing a falsified
version of the promissory note, and finally not providing the modifications of the promissory
notes to Lender 1, which would have revealed PALERMO was behind on payments to German
Motor Corporation.

59.     The FBI interviewed the Chief Credit Officer at Lender 1 who reviewed the GMP
Cars loan approval memo. The Chief Credit Officer did not know that GMP Cars had overdrawn
its Operating Account at CW Bank in September 2019, nor that it continued to be overdrawn in
October and November of 2019, nor that the accounts were restricted. The Chief Credit Officer
felt that this was a material omission and would have been material to Lender 1's decision to
approve and close the loan.

60.     The FBI also interviewed an employee of Lender 1 who worked on the GMP Cars loan application and underwriting. This employee stated that if he knew about the overdraft at CW Bank, then he would have stopped the loan application process and had no further discussions with PALERMO. This employee also stated if he knew there were modifications to the promissory note with German Motors Corporation, they would have been relevant to Lender 1's review.

61.     As part of the SBA 7(a) loan closing, on December 20, 2019, PALERMO received $111,101.91 wired to the GMP Cars LLC account ending at Redwood Credit Union. The address listed for that GMP Cars LLC account is 20 Pimentel Ct., Ste C4, Novato, CA, 94949. The wire sent from Old Republic Title, the escrow agent for the loan, was a federal wire using the Federal Reserve system and constitutes an interstate wire for Count 2 of this Complaint.

62.     For the reasons set forth above, I believe PALERMO made materially false and fraudulent pretenses, representations, and promises to Lender 1 and concealed material facts from Lender 1 in order to secure loans from Lender 1, in violation of 18 U.S.C. § 1343.

**D.  Count Three: False Statement to Bank for Paycheck Protection Program (PPP)**

63.     On April 3, 2020, PALERMO filled out an SBA PPP Borrower Application Form for GMP Cars LLC. In the application, PALERMO stated that GMP Cars had 133 employees with monthly payroll obligations of $693,461. The loan amount was auto calculated to $1,733,000 based on this information.

64.     PALERMO applied for this PPP loan through an FDIC-insured bank ("CP Bank"). PALERMO stated the loan would be used for payroll, lease payments, and utilities.  By April 17, 2020, PALERMO's application had been processed and $1,733,000 had been wired to a GMP Cars LLC account held at CP Bank.

20

65. As part of the application, PALERMO had to make a number of certifications. Applicants have to certify in good faith to all the certifications to be eligible for the PPP loan. One certification PALERMO made was "The Applicant was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC." I believe that this certification PALERMO made to the SBA was false because there is probable cause to believe that PALERMO did not properly pay payroll taxes for his employees in 2019 to 2020.

66. I have learned from the Department of Labor that in the State of California, the Employment Development Department (EDD) administers the Unemployment Insurance (UI) program. A business becomes subject to California state payroll taxes upon paying wages over $100 in a calendar quarter to one or more employees. Once subject to payroll taxes, an employer must complete and submit a registration form to EDD within 15 days. Employers are required to file a Quarterly Contribution Return and Report of Wages (Form DE 9), which reconciles wages reported and taxes paid for each quarter. To be eligible for UI in California, claimants must have worked and earned a minimum amount of wages within the past 18 months. The amount of weekly UI benefits paid to a claimant is based on the claimants' prior earnings, as reported by their employer for a specified time period, called the "base wage" period. EDD prioritizes the immediate financial needs of unemployed workers over collection of payroll taxes from employers; therefore, an employer's delinquency to pay taxes, or utter failure to even register with the EDD, will not affect a claimant's eligibility for benefits.  As long as a claimant shows proof of wages (W2, check stub) on their UI claim, EDD will pay the benefits, if eligible, even though the employer may not have paid any payroll taxes or registered with the EDD.

67. Based on an initial search by a law enforcement agency of EDD records, GMP Cars, LLC last reported 1 employee in the 3rd quarter of 2019. GMP Cars reported 5 employees in the 2nd quarter of 2019 and 100 employees of the 1st quarter of 2019. GMP Cars did not

report any employees from the 4th quarter of 2019 to present. I believe this lack of reporting of employees by GMP Cars indicates that they did not pay payroll taxes for part of 2019 to present.

68.    Based on an FBI interview of a current HR employee at GMP Cars, PALERMO did not allow payroll to be processed through GMP Cars' payroll vendors. The HR employee calculated and prepared the payroll including taxes and deductions with the vendor. PALERMO, however, would not allow the final checks to be processed with the vendor. Instead GMP Cars' controller had the paychecks manually cut through GMP Cars' bank accounts. PALERMO and the controller were in charge of paying the taxes. The HR employee did not have bank account access for GMP Cars and did not know whether GMP Cars was in fact paying payroll taxes. GMP Cars was recently looking for a new payroll system and PALERMO refused to consider any payroll vendor that did not allow the company to manually pay its own taxes outside of the vendor.

69.    Additionally, for approximately the past year, the HR employee had to deal with unemployment claims for each GMP Cars' employee that has been laid off. Each laid-off employee has reached out to the HR employee saying that EDD told the employee that EDD's records indicate the employee has earned nothing or very little. The HR employee then had to manually fill out paperwork to EDD stating the salary information for the employee. The HR employee asked PALERMO and the GMP Cars' controller about this issue, and they just told the HR employee that EDD was never right. I believe the fact that EDD lacks wage information for laid-off GMP Cars employees is another indicator that GMP Cars has not been paying California payroll taxes for its employees.

70.    I also interviewed a former GMP Cars employee who told me that he/she believed GMP Cars was not paying payroll taxes and it was one of the reasons he/she quit. When this former employee took over HR in summer 2019, two employees approached him/her about issues with their W2. The state told the employees they had not paid taxes and owed the state,

22

even though the employees' W2s showed state taxes taken out of their paychecks. The former employee thought this was a red flag and decided to investigate. On a shared document site, the former employee found a spreadsheet updated by the controller regarding payroll taxes. The former employee saw a figure of approximately $400,000 in unpaid taxes. The former employee also tried to search GMP Cars accounting system for tax payments and could only find a few small payments.

71.     The former employee provided me with a copy of the aforementioned spreadsheet. Part of that spreadsheet included the table pasted below. From Q4 2017 to Q1 2019 the table indicated that GMP Cars still owed $341,732.80 in California payroll taxes. GMP Cars had apparently chosen to file certain quarters, but not file others. Even for quarters where taxes were supposedly filed, the entire amount owed was incorrect or not filed. For example, the notes column for Q1 2019 states "Only one payroll filed – Need to file correct amount."

| GMP Cars EDD Payroll Taxes | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Status | Period | Tax Amount | Interest | Penalties | Total | Paid Amount | Remaining Balance Filed | Remaining Balance Not Filed | Notes |
| Filed | Q4 2017 | 62,040.55 | | | 62,040 55 | 33,884.96 | - | 28,155.59 | 33,884.96 was filed -- Estimated amount of actual return is 62k |
| Not Filed | Q1 2018 | 82,264.40 | | | 82,264.40 | | - | 82,264.40 | |
| Not Filed | Q2 2018 | 90,697.48 | | | 90,697.48 | | - | 90,697.48 | |
| Filed | Q3 2018 | 101,866.12 | 1,510.44 | 13,469.30 | 116,845.86 | 80,101.76 | 36,744.10 | (9,457 90) | $101k was assesed -- actual filing should be $92,408 |
| Not Filed | Q4 2018 | 95,190.70 | | | 95,190.70 | | - | 95,190.70 | |
| Filed | Q1 2019 | 28,965.72 | 101.26 | 2,352.61 | 31,419 59 | 13,281.66 | 18,137.93 | | Only one payroll filed - Need to file correct amount. |
| Total | | 461,024.97 | 1,611.70 | 15,821.91 | 478,458.58 | 127,268.38 | 54,882.03 | 286,850.27 | |
| Grand Total Owed | | | | | | | | 341,732.30 | |

72.     Based on a review of PALERMO's American Express statements from January 2015 to August 2019, I only found four payments on June 25, 2019 totaling $61,469.64 to EDD Payroll Tax. Based on a review of GMP Cars LLC business and payroll checking account statements and check images at Redwood Credit Union from October 1, 2019 to March 31, 2020, I saw no payments to EDD.

73.     Based on this information, I believe PALERMO chose not to pay payroll taxes properly in 2019 and 2020. This is why EDD shows no employees for GMP Cars for the past two quarters and why a current GMP Cars HR employee has to provide information to EDD manually regarding each GMP Cars employee that filed for unemployment.  PALERMO's refusal to process tax payments through GMP Cars' payroll vendors is also consistent with deliberate non-payment of payroll taxes. PALERMO falsely certified to CP Bank, a federally insured institution, that he paid payroll taxes for GMP Cars' employees. PALERMO made the certification knowing it was false and for the purpose of influencing CP Bank and securing the PPP loan, in violation of 18 U.S.C. § 1014.

## IV.     **CONCLUSION**

74.     Based on the foregoing, it is my opinion that there is probable cause to believe that Geoffrey Mark PALERMO has committed the following violations of federal law:

a.   Count One: Wire Fraud and Honest Services Wire Fraud, for a kickback scheme PALERMO orchestrated from 2013 through 2016 while managing the Hilton hotel at 750 Kearny Street in San Francisco, CA, in violation of 18 U.S.C. §§ 1343, 1346;

b.   Count Two: Wire Fraud, for defrauding a Small Business Administration (SBA) Preferred Lender in connection with obtaining $5 million in SBA-guaranteed loans in 2019, in violation of 18 U.S.C. § 1343;

c.   Count Three: False Statement in a Loan Application, for making false certifications in April 2020 in order to obtain a Paycheck Protection Program loan through an FDIC-insured bank, in violation of 18 U.S.C. § 1014.

Accordingly, I respectfully request that a warrant for the arrest of PALERMO be issued.  Due to the ongoing COVID-19 pandemic, I am also requesting a summons for PALERMO. The FBI and

U.S. Attorney's Office will evaluate whether the summon is a practical alternative to arrest in this case.

## V.     **REQUEST FOR SEALING**

75.      I respectfully request that the Court issue an order sealing, until further order of the Court, the Criminal Complaint and all papers submitted in support of this Criminal Complaint, including this affidavit. I believe that sealing is necessary in order to effectuate the orderly arrest or self-surrender of PALERMO and in order to guard against flight and destruction of evidence.

I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

/s/ Alexandra Bryant
via telephone
ALEXANDRA E. BRYANT
Special Agent
Federal Bureau of Investigation

Sworn to before me over the telephone and signed by me this 29th day of May 2020.

HON. ALEX G. TSE
United States Magistrate Judge